UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ECETRA N. AMES | * | |
| | * | |
|      Plaintiff, | * | CIVIL ACTION NO. 09-7058 |
| | * | |
| VERSUS | * | |
| | * | SECTION " " |
| JOHN B. OHLE, III; BANK ONE | * | |
| CORPORATION, n/k/a | * | |
| J. P. MORGAN CHASE & CO.; | * | MAGISTRATE DIVISION ( ) |
| DOUGLAS STEGER; | * | |
| KENNETH A. BROWN; AND | * | |
| DENISE E. DAVILA BROWN, | * | |
|      Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>COMPLAINT</u>

**NOW INTO COURT,** through undersigned counsel, comes Plaintiff, ECETRA N. AMES, who respectfully files this Complaint against JOHN B. OHLE III, BANK ONE CORPORATION n/k/a J.P. MORGAN CHASE & CO., KENNETH A. BROWN, and DENISE E. DAVILA BROWN, collectively, "Defendants" as follows:

# I.

## PARTIES

1.     Plaintiff ECETRA N. AMES, is settlor and income beneficiary of the Anthony M. & Ecetra N. Ames 1999 Charitable Remainder Unitrust, established by agreement, executed by Plaintiff Ames, as settlor, and by John B. Ohle III, as trustee, on December 17, 1999 (the "Trust"). Plaintiff Ames is a natural person of the full age of majority, a citizen of the State of New York and a resident of the city of New York, New York County.

2.     Defendant BANK ONE CORPORATION, n/k/a J. P. MORGAN CHASE & CO., was, at all relevant times herein, a business entity formed under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois, in good standing in and authorized to do and doing business in the State of Louisiana.

3.     Upon information and belief, Defendant JOHN B. OHLE, III is a natural person of the full age of majority, a citizen of the State of Illinois and a resident of the city of Wilmette, Cook County.

4.     Upon information and belief, Defendant DOUGLAS STEGER is a natural person of the full age of majority, a citizen of the State of New York and a resident of the city of Orchard Park, Erie County.

5.     Upon information and belief, Defendant KENNETH A. BROWN is a natural person of the full age of majority, a citizen of the State of Arizona and a resident of the city of Tucson, Pima County.

6.      Upon information and belief, Defendant DENISE E. DAVILA BROWN is a natural person of the full age of majority, a citizen of the State of Arizona and a resident of the city of Tucson, Pima County.

## II.

## JURISDICTION AND VENUE

7.      This Honorable Court has jurisdiction over this civil action pursuant to 18 U.S.C. §§ 1964(a) and 1964(c), and 28 U.S.C. §§ 1331 and 1337. This is a civil action arising under 18 U.S.C. §§ 1961-1968, §901(a) of Title IX of the Organized Crime Control Act of 1970, as amended, otherwise known as the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and in particular, under 18 U.S.C. § 1964 and other causes of action as set forth hereafter. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

8.      Venue lies in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391. Defendants at relevant times conducted substantial business in this district. The violations occurred in this district. Plaintiff was approached by defendants in this district with an alleged tax-saving scheme on money held in bank accounts in this district. Defendants transact or have transacted their affairs in this district, and their concerted conduct, upon which this action is founded, was directed at and intended to injure Plaintiff in this district.

9.      Defendants, either on their own or through their agents, at the time of the commission of the acts alleged hereunder, were found in, and/or transacted business in the State of Louisiana, approached Plaintiff in this district, and the cause of action that is the object of this Complaint arises out of business transactions in the State of Louisiana, including specific acts within this district, including but not limited to the abuse of money that was held in this district.

10.     Defendants, either on their own or through their agents, conspired to commit within the State of Louisiana the wrongful acts alleged in this Complaint and/or committed or participated in the commission of those acts within or without the State of Louisiana, purposefully directing their wrongful acts toward the forum of Louisiana, causing in Louisiana, directly or indirectly, the violations of RICO and the other causes of action set forth herein and Plaintiff's resultant injuries.

### III.

### INTRODUCTION

11.     Plaintiff alleges claims under RICO, as well as under state law for declaratory judgment and unjust enrichment, breach of fiduciary duty, fraud, negligent representation, breach of contract and civil conspiracy. Plaintiff seeks disgorgement of the unethical, excessive, and illegal and fraudulent fees paid to the Defendants, jointly and in solido with other co-conspirators, plus compensation for all other damages sustained, including without limitation all fees and costs she has incurred or will incur responding to the federal and state tax agencies as a result of the Defendants' actions, and any additional amounts, such as taxes, interest, and penalties, that have been and may be assessed against her by federal and state tax agencies, all of which damages must be trebled under RICO. Plaintiff also seeks all attorneys' fees and costs incurred in this matter under RICO.

12.     Plaintiff seeks a judgment against each defendant jointly and in solido with all unnamed co-conspirators for all damages sustained.

13.     The Defendants, along with certain unnamed co-conspirators (the "Enterprise," as further defined below, individually "Members of the Enterprise" or "Members"), entered into various arrangements amongst themselves to market and promote certain tax strategies to high net-worth individuals and business entities. The Enterprise arranged to solicit high net-worth participants, like

Plaintiff, who was induced with misrepresentations to engage in this tax strategy and other transactions and pay the Enterprise exorbitant fees for advice that the Defendants and other Members of the Enterprise knew or should have known was improper and illegal.

14.    John B. Ohle, III ("Ohle"), a licensed attorney, certified public accountant and certified financial planner, was engaged in 1998 by Plaintiff to provide tax return services, financial planning services, and consultation for sophisticated tax planning strategies.

15.    In the latter part of 1999, Ohle presented Plaintiff with a tax strategy by which Plaintiff would contribute $5,000,000.00 to a charitable remainder unitrust, of which Ohle would be trustee, providing for distributions to Plaintiff during her lifetime based on a fixed percentage of the value of the trust's assets as of the beginning of each calendar year.

16.    The charitable remainder trust was drafted by or at the direction of Ohle; in December 1999, the trust, designated as the "Ecetra N. Ames and Anthony M. Ames 1999 Charitable Remainder Unitrust" (hereinafter, the "Trust"), was executed by Plaintiff, and 45,480 shares of Proctor & Gamble Company common stock belonging to Plaintiff, having a value of $4,982,903.00, were contributed to the trust. The instrument creating the trust named Ohle as trustee and provided, among other things, for a trustee's fee payable annually to Ohle of 75 basis points (0.75%) of the value of the Trust's assets at the beginning of each calendar year.

17.    In the latter part of 2000, Ohle recommended to Plaintiff, as part of his undertaking to provide financial planning advice and to present sophisticated tax strategies, that Plaintiff contribute another 38,000 shares of Proctor & Gamble company stock, having a value of $2,814,375.00, to the Trust, and on November 16, 2000, those shares were transferred from Plaintiff's custody account at Whitney National Bank to the Trust's account at Charles Schwab &

5

Co. The written instructions to accomplish this transfer were prepared by Ohle for Plaintiff's signature, and sent by Ohle to Whitney National Bank.

18.     During 2001, Plaintiff contributed back to the Trust two of the trust distributions to which she was entitled. On or about May 25, 2001, $91,712.00 was added to the Trust in this manner, and on or about June 7, 2001, another $91,712.00 was contributed. Plaintiff has no training or experience with business or investment matters and relied on Ohle to assist her with her financial and tax planning.

19.     Douglas Steger, a co-conspirator, was a resident of Northfield, Illinois. From approximately 1989 until approximately late 2001, Douglas Steger owned and operated American Financial Capital Corporation ("AmCap"), which was engaged in the business of raising money for hedge funds, including a Bermuda-based hedge fund called Carpe Diem. AmCap maintained a bank account at North Shore Community Bank in Wilmette, Illinois.

20.     In the latter part of 2001, Ohle approached Plaintiff with the idea of purchasing Carpe Diem Dynamic Fund Linked Warrants (the "Carpe Diem Warrants"), and in November 2001, Ohle presented documents to Plaintiff to acquire the Carpe Diem Warrants. Among the documents presented by Ohle to Plaintiff was a letter of wiring instructions, directing Whitney National Bank to wire transfer $5,000,000.00 to an account at Chase Manhattan Bank NA in New York for credit to the account of a bank and eventually a trust located outside of the United States. Plaintiff signed the instructions and the transfer was made from Plaintiff's custody account at Whitney National Bank as indicated in the instructions.

21.     After the $5,000,000.00 transfer was made for the Carpe Diem Warrants, Ohle instructed Carpe Diem Dynamic Fund to transfer $250,000.00 to Steger, the Chicago investment

broker, as a fee, and the balance to SG Cowen Securities in New York to purchase $4,750,000.00 of Carpe Diem Warrants for Plaintiff's accounts. The $250,000.00 fee to Steger was only disclosed to the Ames much later, in the context of a Settlement Agreement between Ohle and Plaintiff, executed by Ohle on August 22, 2003 (the "Settlement Agreement").

22.     At approximately the same time that $4,750,000.00 of Carpe Diem Warrants were purchased for Plaintiff's account, Ohle, acting as trustee of the Trust, transferred $2,000,000.00 of the Trust's cash to the account of the Carpe Diem Fund, instructing the Carpe Diem Fund to transfer $100,000.00 to Douglas E. Steger, the Chicago broker, and the remaining $1,900,000.00 to SG Cowen Securities in New York to purchase Carpe Diem Warrants for the Trust. The $100,000.00 transfer to Steger was only disclosed to Plaintiff much later, in the context of the Settlement Agreement.

23.     In June 2002, Plaintiff's Carpe Diem Warrants were sold and the proceeds of the sale, in the amount of $4,100,549.27, were wire transferred by SG Cowen Securities to the Trust's account at Charles Schwab & Co. pursuant to a redemption notice (the "Redemption Notice") dated July 26, 2002, prepared by Ohle and presented to Plaintiff for signature, directing that her investment in the Fund be liquidated. The Redemption Notice further directed that the proceeds were to be wired to an account at Charles Schwab & Co., Inc., described in the Redemption Notice as "1999 Ecetra N. Ames, Account #3060-2347."

24.     The Charles Schwab account designated in the Redemption Notice was actually titled "John B. Ohle III, Trustee, Anthony M. & Ecetra N. Ames 1999 CRUT," and the proceeds from Plaintiff's liquidation of her investment in the Fund were therefore wired to, and deposited in, an account owned by the Trust. Plaintiff received a confirmation on August 8, 2002, that funds in the

amount of $4,100,549.27 had been wired from her account according to her instructions on August 8, 2002. The confirmation did not state where the funds had been wired.

25.     At about the same time as the sale of Plaintiff's personal Carpe Diem Warrants, Ohle, acting as trustee of the Trust, sold the Trust's remaining Carpe Diem Warrants, and the proceeds were likewise transferred to the Trust's Charles Schwab & Co. account.

26.     The amount transferred from Plaintiff's personal accounts to the Trust's account totals $11,989,538.00.

27.     During the time period from the commencement of the Trust on December 17, 1999 until the latter part of 2001, the Trust experienced substantial losses in value of its stock portfolio.

28.     Kenneth A. Brown was an investment advisor who resided, at times relevant to this matter, in San Francisco, California. In late 2001, Brown worked as an investment advisor, providing investment consulting services to clients.

29.     During the years 2000 and 2001, the Trust paid investment advisory fees of $106,248.00 to Kenneth A. Brown and Denise E. Davila Brown, investment advisors selected and supervised by Ohle. Neither the sales of stocks in late 2001 nor the purchase of the Carpe Diem Warrants were considered or approved by the investment advisors.

30.     Ohle did not send statements to Plaintiff covering the assets, liabilities, receipts and distributions from the Trust, and provided no accounting of his administration of the Trust until an account was requested on behalf of Plaintiff in March 2003.

31.     On August 22, 2003, Ohle executed a Settlement Agreement regarding some of his actions as set forth herein. At that time, Plaintiff was first apprised of the fees paid to Steger. She was never apprised of the fees paid to Kenneth A. Brown and Denise E. Davila Brown, nor of certain

8

other kickbacks associated with the Carpe Diem Warrants scheme, which were finally brought to light in the context of Grand Jury Indictment of Ohle, Number 08-Crim. 1109, filed in the United States District Court for the Southern District of New York on November 1, 2008 ("Indictment," attached hereto as Exhibit 1). The Plaintiff did not know, and could not have reasonably learned, of the full extent of the defendants' conducts and her injuries from that conduct until November 1, 2008.

32.     The Indictment states, in the section titled "Object of the Conspiracy," that Ohle, "together with others, unlawfully, knowingly, and intentionally having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, ... to wit, *the unlawful diversion and embezzlement of funds belonging to a wealthy trust client of Ohle [Plaintiff]*, and for the purpose of executing such scheme and artifice and attempting so to do, would and did transmit and cause to be transmitted by means of wire and radio communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, interstate telephone calls, faxes and e-mails, in violation of Title 18, United States Code, Sections 1343 and 1346" (emphasis added).

## IV.

### FIRST CAUSE OF ACTION

### CIVIL VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

33.     Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

34.     Plaintiff is a "person" within the meaning of 18 U.S.C. § 1964(c).

35.     At all times relevant hereto, Plaintiff and Members of the Enterprise were "persons" within the meaning of 18 U.S.C. § 1961(3).

### The RICO Enterprise

36.     An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

37.     The enterprise at issue in this case, for purposes of 18 U.S.C. §§ 1961(3) and 1962(a), 1962(b), 1962(c) and 1962(d), is an association-in-fact of all unnamed co-conspirators and Defendants – "Members of the Enterprise" – collectively referred to herein as "the Enterprise." The wrongdoers that were part of the association-in-fact Enterprise include Defendants, banking institutions, law firms that issued the opinions, accountants that reviewed the strategies, and accountants that drafted the Plaintiff's applicable tax returns, as well as those employees and agents of Members of the Enterprise and other non-defendant entities that participated in the fraudulent representations to Plaintiff, the public, the courts, and various regulatory and enforcement agencies. In fact, at times throughout the years the Enterprise conducted these schemes, the number of Members conspiring and colluding in the Enterprise fluctuated because the Enterprise would newly solicit some additional co-conspirators and discharge others, in order to increase profitability.

38.     While Defendants participated in the Enterprise and were a part of it, Defendants also have an existence separate and distinct from the Enterprise.

39.     Defendants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

40.     Defendants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme.

10

41.    The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

42.    Defendants and all other Members of the Enterprise shared fees, costs, information, resources, and the fruits of its predicate acts. The association-in-fact Enterprise, Defendants and other Members of the Enterprise, was a formal, ongoing relationship that functioned as a continuing unit, pursuing a course of conduct as set forth above (*i.e.,* the pursuit of customer prospects, the promotion and the sale of the series of tax strategies and, importantly, the sharing of fees), with a common or shared purpose (*i.e.,* to convince potential clients to allow it to attempt to eliminate those clients' tax liabilities, all the while charging exorbitant fees for the shared benefit of the Members of the Enterprise) and continuity of structure and personnel (including partners, associates, and support staff).

43.    Defendants and those employed by and/or associated with the Enterprise, which engaged in interstate commerce, have conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(a) and (b), and have conspired to violate § 1962(c) in violation of § 1962(d) by pursuing and soliciting clients, designing, creating, engineering, implementing, marketing, promoting, and/or selling and inducing the purchase of transactions that were designed to reduce or eliminate tax liability and that have been, or will be, determined by the IRS to be illegal and/or abusive tax shelters under IRS Notice 2000-44, IRS Announcement 2004-46, and/or other IRS Notices or Announcements, and by collecting exorbitant fees therefor.

44.    Defendants have violated 18 U.S.C. § 1962(d), inasmuch as they knowingly, intentionally, and unlawfully, aided and abetted each other and the Enterprise and conspired to

conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise, through the pattern of racketeering activity described herein.

**The Scheme**

45.    As set forth hereinabove, for a substantial period of time, the Members of the Enterprise knowingly, intentionally, and directly participated in, or aided and abetted, counseled, commanded, induced, procured, or caused and conspired in the pursuit of and solicitation of and eventual inducement of clients to participate in tax strategies that were purportedly designed to reduce or eliminate tax liability for their clients by means of false or fraudulent representations or promises by the use of the mails and/or wires for purposes of the execution of their scheme, and received exorbitant fees therefor, which were split amongst the Members regardless of their participation in any one transaction.

46.    The particulars of the scheme concocted by the Enterprise in order to reduce or eliminate tax liability by means of false or fraudulent representations or promises in the instant case consist of the following:

(a)    Ohle lacked the training and experience to advise Plaintiff on all aspects of her financial and tax planning, and as indicated below, recommended that Plaintiff purchase investments and pursue tax strategies that were not appropriate for her and not in accord with normal goals and objectives for financial planning.

(b)    In November 2001, Ohle recommended to Plaintiff that she purchase the Carpe Diem Warrants, and represented to her that the Carpe Diem Warrants had considerable upside potential, but also that they had built-in downside protection. In fact, the

Carpe Diem Warrants had no built-in downside protection, and, had she known this, she would not have purchased the Carpe Diem Warrants.

(c)     Ohle did not advise Plaintiff of his agreement to pay Douglas E. Steger, the Chicago broker, a $250,000.00 "fee" for services rendered in connection with the acquisition of the Carpe Diem Warrants. Plaintiff was not aware that the $250,000.00 fee was involved until Plaintiff examined the first statement from SG Cowen for the Carpe Diem Warrants account showing that only $4,750,000.00, rather than $5,000,000.00, was invested in the warrants. The fee was neither required by nor paid to Carpe Diem Dynamic fund or SG Cowen Securities (the issuer of the Carpe Diem Warrants). Douglas E. Steger performed no significant services in connection with the arrangement or acquisition of the Carpe Diem Warrants. Plaintiff would never have purchased the Carpe Diem warrants had she known that a $250,000.00 fee would be paid to acquire them. Ohle authorized and directed Carpe Diem Fund to pay the $250,000.00 fee from Plaintiff's Carpe Diem fund account without the knowledge or authority of Plaintiff.

(d)     When Ohle recommended to Plaintiff that she form the Trust, he drafted the trust instrument himself and did not suggest that the trust be reviewed by independent counsel, even though he had a conflict of interest because of the fees that he would charge for the administration of the Trust if the tax strategy was adopted by Plaintiff.

(e)     Ohle did not give Plaintiff a written explanation of the terms and conditions of the Trust, the provision for delegating investment responsibility, the provisions for fees for the trustee and investment advisors, the irrevocable nature of the Trust, or the tax

13

consequences of creating the Trust. The explanations given to Plaintiff misled her into believing that all of the distributions to her from the Trust should be considered spendable "income" from the Trust when the Trust was in fact returning the principal that she contributed to it.

(f)    In the latter part of 2000, the value of the assets of the Trust had declined substantially, and Ohle recommended that Plaintiff add 38,000 shares of Proctor & Gamble stock to the Trust in order to keep the value of the trust at its original level or above. In making this recommendation to Plaintiff, Ohle violated his duty to Plaintiff as a tax strategist and financial planner because he did not advise her that (i) the aggregate contributions to the Trust would rise from $5,000,000.00 to $7,800,000.00, (ii) contributions of a total of $7,800,000.00 were inconsistent with their original goals and objectives for the Trust, (iii) the addition of assets would raise the level of Ohle's compensation from the Trust, (iv) aggregate contributions of $7,800,000.00 to the Trust were far in excess of sensible tax and financial planning for persons of the means of Plaintiff, (v) it was unlikely in a down securities market and a period of low interest rates that the Trust would generate income and gains necessary to meet the 8.062% annual distribution, and consequently, the value of the Trust would likely decline if such conditions continued, and (vi) any objective of producing more spendable cash could be met without parting with the principal and subjecting the money to the additional fees and complications that the trust would impose. As an attorney and certified financial planner, Ohle failed to advise Plaintiff that he had a conflict of interest in recommending the additional

14

contribution to the Trust because of the increase in fees that Ohle would receive as a result of the contribution, and failed to advise her to have the transaction reviewed by independent counsel and advisors. Had Plaintiff been properly and competently advised in connection with the proposed contribution of 38,000 shares of Proctor & Gamble stock to the Trust, Plaintiff would not have made the additional contribution to the Trust and would not have suffered the financial losses that resulted from the contribution.

### Predicate Acts

47.     With respect to the activities alleged herein, the Enterprise acted at all times with malice toward the Plaintiff, with the intent to engage in the conduct complained of for the monetary benefit of Defendants and other Members of the Enterprise. Such conduct was done with actionable wantonness and reckless disregard for the rights of Plaintiff. The predicate acts were acts of deception which furthered the goal of soliciting clients to participate in what the Enterprise knew or should have known was fraudulent and would be deemed abusive by the IRS. The Enterprise knew that it was placing individuals and/or business enterprises in these strategies, likely foreclosing any possibility that the tax authorities would find in favor of their clients.

48.     With respect to the activities alleged herein, the Enterprise sought to aid and abet and actually did aid and abet a transaction to violate 18 U.S.C. §§1962(a), (b) and (c). Each Member of the Enterprise, including Defendants, agreed to interfere with, obstruct, delay or affect interstate commerce by attempting to obtain and actually obtaining fees to which Defendants and other Members of the Enterprise were not entitled.

15

49.     With respect to the overt acts and activities alleged herein, each Member of the Enterprise conspired with each other co-conspirator entity or to violate 18 U.S.C. §§1962(a), (b) and (c), all in violation of 18 U.S.C. §1962(d). In violation of §1962(c), each Member of the Enterprise agreed and conspired with each other Member, to: a) pursuant to §1962(a), invest fees paid by Plaintiff into pursuing and soliciting other clients, inducing and causing other individuals and business entities to participate in the tax strategies at issue; and b) pursuant to §1962(b), acquire or maintain property interests to which the Enterprise was not entitled through racketeering activity which included charging and sharing exorbitant fees for tax strategies it knew or should have known would be deemed unacceptable by the IRS.

50.     The Enterprise and its individual Members exceeded any legitimate role of diligent tax advisers by designing, creating, engineering, implementing, marketing, promoting and/or selling a series of these tax strategies in an attempt to conspire to obtain money in the form of fees and commissions, knowing that the underlying strategies were likely not defensible to the IRS. Upon information and belief, the Enterprise participated in some of these transactions via partnerships that it formed to make the strategies perform. Many of these tax strategies have been deemed illegal and/or abusive pursuant to IRS Regulations, Notices and Announcements.

51.     The Enterprise was in the best position to know that these strategies were potentially illegal and/or abusive. The Enterprise and its co-conspirators placed several hundred, perhaps over a thousand, individuals and business entities into these strategies and yet failed to reveal to the Plaintiff the number of other participants that were pursued and solicited by the Enterprise for placement into and that were actually induced to participate in the same or similar tax strategies. The

16

Enterprise knew, should have known, and was in the best position to know that these strategies would not withstand the challenge and/or scrutiny of the Internal Revenue Service.

52.     The Enterprise and its co-conspirators failed to reveal to Plaintiff the number of other participants that were pursued and solicited by the Enterprise for placement into and that were actually induced to participate in the same or similar tax strategies which the Enterprise knew, should have known, and was in the best position to know would not withstand the challenge and/or scrutiny of the Internal Revenue Service. The collective number of the strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted and/or sold compromised the viability of all of the transactions globally. Thus, although the Defendants knew or should have known that the tax scheme they promoted would be deemed illegal and/or abusive, the sheer volume of transactions solicited by the Defendants foreclosed any possibility that the tax authorities would find in favor of the Plaintiff.

53.     The Enterprise's schemes have resulted in severe financial and business losses to the Plaintiff. Moreover, as a result of the Enterprise's wire fraud and mail fraud violations, Plaintiff has suffered extensive monetary damages consisting of unexpected tax liability, fees and commissions paid to the Enterprise, as well as interest and penalties demanded by the Internal Revenue Service. Plaintiff has also suffered additional damages, including but not limited to opportunity costs, additional legal, tax advisor and accountant fees and reputation damage.

54.     The Enterprise's documents and communications associated with the schemes at issue contained false and/or misleading representations.

55.     These misrepresentations constitute "false or fraudulent pretenses, representations or promises" within the meaning of the mail fraud (18 U.S.C. §1341) and wire fraud (18 U.S.C. §1343) provisions.

56.     All of the Members of the Enterprise actively participated in this elaborate and abusive scheme to obtain money from Plaintiff, including Defendants herein and others who are not named as defendants to this matter.

57.     The numerous predicate acts of mail and wire fraud described herein are part of separate fraudulent transactions by the Enterprise designed to defraud the Plaintiff of money and property interests under false pretenses. As the victim of these unlawful patterns of illegal behavior, Plaintiff has continued to suffer losses.

58.     In carrying out the overt acts and fraudulent transactions described herein, the Enterprise engaged in conduct in violation of various state and federal laws and regulations, including but not limited to 18 U.S.C. §§1341, 1343, 1346 and 1961 *et seq*, and both state and federal banking laws.

59.     18 U.S.C. § 1961(1) provides that "racketeering activity means any act indictable under any of the following provisions of Title 18, United States Code: § 1341 (relating to mail fraud), § 1343 (relating to wire fraud), and § 1346 (relating to scheme or artifice to defraud).

**Violations of 18 U.S.C. Sections 1341 and 1343**

60.     For the purpose of executing and/or attempting to execute its transaction to defraud and to obtain money by means of false pretenses, representations or promises, the Enterprise, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories for mail, matter and things to be sent or delivered by the Postal Service and received matter and things

therefrom including but not limited to contracts, instructions, correspondence, opinion letters, checks, and other items.

61.    For the purpose of executing and/or attempting to execute its transaction to defraud and obtain money by means of false pretenses, representations or promises, the Enterprise, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things therefrom, including but not limited to contracts, instructions, correspondence, opinion letters, funds, and other things.

62.    The Enterprise's use of the mails and wires includes private and public components.

63.    The Members of the Enterprise utilized the U.S. Mail and wire to communicate among themselves, as well as with their co-conspirators and clients. Defendants lived and worked in the States of Illinois and Arizona and participated in this scheme from there. In order to carry out and implement its scheme, the Enterprise necessarily had to communicate using the mails and wires.

64.    In those matters and things sent or delivered by the Postal Service, by wire and through other interstate electronic media, the Enterprise falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiff, in violation of 18 U.S.C. §§ 1341 and 1343.

65.    The Enterprise intentionally and knowingly made these misrepresentations and intentionally and knowingly suppressed material facts from Plaintiff for the purpose of deceiving her and thereby obtaining financial gain. The Enterprise either knew, should have known, or recklessly disregarded that the misrepresentations and omissions described herein were material. Plaintiff justifiably relied on the misrepresentations and omissions in carrying out the transactions, subsequently filing her tax returns, and in paying unnamed co-conspirators and Defendants.

66.    Plaintiff has therefore been injured in its business or property by the Enterprise's overt acts and racketeering activities.

**Pattern of Racketeering Activity**

67.    The violations set forth herein constitute "racketeering activities" or "predicate acts" within the meaning of 18 U.S.C. § 1961(l).

68.    The Enterprise has engaged in a "pattern of racketeering activity," as defined in § 1961 of RICO, by committing and/or conspiring to commit or aiding and abetting a transaction with at least two such acts of racketeering activity, as described specifically herein, within the past ten years. In fact, upon information and belief, each of the Members of the Enterprise and its co-conspirators have committed at minimum several hundred acts of racketeering activity. Each act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting similar victims, including Plaintiff herein.

69.    The Enterprise's innumerable racketeering activities or predicate acts are related and also amount to a continuous criminal activity.

70.    These predicate acts are related in the sense that they have the same purpose (to carry out the scheme described herein); result (to obtain money); victims (such as Plaintiff herein and several hundred, if not thousands, of others); method of commission (the scheme described herein); and are otherwise interrelated by distinguishing characteristics and are not isolated events, because they were carried out for the same purpose.

71.    The predicate acts were committed in the same manner, and they constituted the Enterprise's "normal" way of doing business with regard to pursuing and soliciting clients, inducing them to participate, and then giving tax strategy advice.

72.    The related predicates amount to a continued criminal activity because they extended over a substantial period of time.

73.    The Enterprise's course of action entails a span of years, during which Defendants committed numerous, related predicate acts, as set forth specifically herein, as part of its continuing scheme. Also, the predicate acts are closely intertwined as far as actors, goals, nature, functioning, and structure of the operations described herein in the persecution of Plaintiff and the Enterprise's several hundred, perhaps over a thousand, other victims.

74.    The multiple acts and the continuity and relatedness of racketeering activity committed and/or conspired to commit or aided and abetted in committing by unnamed co-conspirators and Defendants, as described herein, were related to each other, amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

**V.**

**SECOND CAUSE OF ACTION**

**DECLARATORY JUDGMENT AND UNJUST ENRICHMENT**

75.    Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

76.    An actual, justiciable controversy exists between Plaintiff on the one hand and the Defendants and other Members of the Enterprise on the other.

77.    Had the Plaintiff not been pursued, solicited, and enticed to enter into the tax strategies designed, created, engineered, implemented, marketed, promoted, and/or sold by the Enterprise, she would not have paid fees to Defendants and other Members of the Enterprise.

78.     The payment of fees to Defendants and other unnamed co-conspirators enriched Defendants and other unnamed co-conspirators and was to the detriment of Plaintiff.

79.     Plaintiff seeks a declaration that, due to the foregoing lack of consideration, the Enterprise has been unjustly enriched and all fees paid to the Enterprise, including but not limited to fees paid to Defendants, should be returned to Plaintiff.

80.     Finally, Plaintiff seeks an award of costs and reasonable and necessary attorneys' fees as are equitable and just.

## VI.

### THIRD CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

81.     Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

82.     The Enterprise was Plaintiff's fiduciary, and thus owed to Plaintiff the duties of honesty, loyalty, care, and compliance.

83.     The Enterprise breached its fiduciary duties to Plaintiff by advising Plaintiff to engage in the tax strategies designed, created, engineered, implemented, marketed, promoted, and/or sold by the Enterprise in reliance on its advice, representations, recommendations, instructions, and opinions, which the Enterprise knew or should have known to be improper and illegal, based on its Members' prior experience with similar strategies which they had also promoted for the purpose of generating huge fees for the Enterprise.

84.     The Enterprise breached its fiduciary duties to Plaintiff by committing the acts and/or omissions set forth above.

85.    As a result of the Enterprise's conduct set forth herein, Plaintiff has suffered injury in that she, among other things: a) paid to the Defendants and other Members of the Enterprise exorbitant fees, b) took undue financial risk, c) has incurred tax penalties and interest, d) has incurred opportunity costs; e) has incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation, f) has incurred reputation damage, and g) has foregone alternative tax opportunities.

86.    As a proximate cause of the foregoing, Plaintiff has been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

**VII.**

**FOURTH CAUSE OF ACTION**

**FRAUD & DETRIMENTAL RELIANCE**

87.    Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

88.    The Enterprise made false and misleading statements in violation of the laws of the United States and the State of Louisiana as set forth herein.

89.    The Enterprise made misrepresentations to the Plaintiff herein for the purpose of inducing Plaintiff to participate in its schemes and to pay the Enterprise enormous sums of money to Defendants.

90.    In order to induce the Plaintiff to pay it exorbitant fees, the Enterprise made numerous knowingly false affirmative representations and intentional omissions of material facts to Plaintiff, including but not limited to those acts and/or omissions set forth above.

91.    The above intentional omissions of material fact and/or affirmative representations made by the Enterprise and its unnamed co-conspirators were false when made and the Enterprise knew or should have known these representations to be false when made with the intention that Plaintiff rely on them in deciding whether or not to take the advice of the Enterprise and thereby pay it exorbitant fees and commissions. In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were made knowingly by the Enterprise with the intent to induce Plaintiff to enter into the abusive tax strategies and pay it exorbitant fees.

92.    In reasonable reliance on the Enterprise's false affirmative representations and intentional omissions of material facts regard the transactions at issue, Plaintiff paid to the Enterprise exorbitant fees to execute the transactions, did not avail itself of alternative tax opportunities, filed federal and state tax returns that have been deemed to reflect improper deductions for capital and ordinary losses resulting from the transactions, and did not amend her tax returns.

93.    But for the Enterprise's intentional misrepresentations and material omissions described herein, Plaintiff would never have engaged the Enterprise for advice on her tax strategies, engaged in the transactions at issue, claimed the purportedly resulting capital and/or ordinary losses on her income tax returns, filed and signed her tax returns in reliance on the advice of the Enterprise, failed to amend her tax returns, and/or failed to avail herself of other alternative tax opportunities.

94.    After discovering the Enterprise's fraud, Plaintiff incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation. As a result of the Enterprise's conduct set forth herein, Plaintiff has suffered injury in that she, among other things: a) paid to the Defendants and other Members of the Enterprise exorbitant fees, b) took undue financial risk, c) has incurred tax penalties and interest, d) has incurred opportunity costs; e) has and

24

will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation, f) has incurred reputation damage, and g) has foregone alternative tax opportunities.

95.    As a proximate cause of the foregoing, Plaintiff has been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

## VIII.

## FIFTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

96.    Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

97.    As trustee of the Trust, Ohle negligently managed the investments of the Trust by (i) failing to select and appoint an investment advisor that had the background or experience to manage investments for a charitable remainder unitrust, (ii) failing to supervise the investment advisor or to recognize that the investments selected by the investment advisor were inappropriate for a charitable remainder trust, and (iii) purchasing $2,000,000.00 of Carpe Diem Warrants that were clearly inappropriate for the Trust.

98.    As Trustee of the Trust, Ohle overcompensated the investment advisor for the Trust and failed to obtain a refund of investment advisory fees after he decided to dispense with the investment advisor's services and make investment decisions himself in 2002.

99.    As trustee of the Trust, Ohle negligently or intentionally agree to pay a $100,000.00 commission or finder's fee to Douglas E. Steger that was ill-advised, and overcompensated Steger for the services, if any, rendered by Steger to the Trust.

100.    As personal financial and tax advisor to Plaintiff, Ohle negligently or intentionally misled Plaintiff to transfer $4,100,594.27 in cash to an account in the name of the Trust in November 2002, permitting Plaintiff to believe that the funds were to be transferred to a temporary account pending later decisions on a permanent disposition thereof. Ohle failed to warn Plaintiff that (i) the funds were going to the Trust and, under the terms of the Trust, could not be recovered, and (ii) that he had a conflict of interest in seeing the funds go to the Trust because of a large increase in Trust fees payable to him as a result of the transfer.

101.    Plaintiff was misled into believing that the $4,100,549.27 proceeds of her personal Carpe Diem Warrants would be transferred to a temporary money market account, because the transfer instructions, prepared by Ohle, identified the transferee account as "1999 Ecetra N. Ames, Account #3060-2347," when, in fact, the Charles Schwab & Co. account designated in the Redemption Notice was actually titled "John B. Ohle III, Trustee, Anthony M. & Ecetra N. Ames 1999 CRUT," and the proceeds from Plaintiff's liquidation of her investment in the Fund were therefore wired to, and deposited in, an account owned by the Trust. Plaintiff received a confirmation on August 8, 2002, that funds in the amount of $4,100,549.27 had been wired from her account according to her instructions on August 8, 2002. The confirmation did not state where the funds had been wired. Plaintiff represents that she did not understand when she signed the Redemption Notice that it directed that the funds be wired to an account owned by the Trust rather than to an account owned by her individually, nor did she understand that through the Redemption Notice she was making a donation to the Trust. Plaintiff further represents that she understood that the $4,100,549.27 was to be transferred to a money market account pending further decisions on investment of the funds.

102.    As a result of the actions and omissions of Ohle in directing the $4,100,549.27 cash amount to the account of the Trust, Plaintiff may have lost the use of that amount, unless she can obtain a tax ruling recognizing the error and authorizing the repayment thereof to Plaintiff, a process that will be costly and time consuming.

103.    As financial planner and tax strategist to Plaintiff, Ohle had a duty to advise her that (i) contributions of cash to charitable remainder trusts, rather than low-basis assets, results in the loss of a large segment of the tax benefits of making such contributions, (ii) the contribution of an additional $4,100,549.27 to the Trust would bring the aggregate contributions to $11,989,538.00, (iii) aggregate contributions of $11,989,538.00 to the Trust were not in accord with the personal planning goals and objectives of the trust, (iv) aggregate contributions of $11,989,583.00 were far in excess of sensible tax and financial planning for persons of the means of Plaintiff, (v) it was unlikely in a down securities market and a period of low interest rates that the Trust would generate income and gains necessary to meet the 8.062% annual distribution, and consequently, the value of the Trust would likely decline if such conditions continued, and (vi) any objective of producing more spendable cash could be met without parting with the principal and subjecting the additional money to the additional fees and complications that the trust would impose. As an attorney and a certified financial planner, Ohle failed to advise Plaintiff that he had a conflict of interest in recommending the additional contribution to the Trust because of the increase in fees that Ohle would receive as a result of the contribution, and failed to advise to have the transaction reviewed by independent counsel and advisors. Had Plaintiff been properly and competently advised that the transfer of $4,100,549.27 was going to the Trust, Plaintiff would not have authorized the transfer and would not have suffered the financial losses that resulted from the contribution.

27

104.    As a result of the negligent or intentional actions of Ohle, as trustee of the Trust, outlined above in this Agreement, Plaintiff has asserted that she is entitled, as income beneficiary of the Trust, to judicial relief under Section 1789 of the Louisiana Trust code to have Ohle removed as trustee of the Trust and is entitled under Section 2201 of the Louisiana Trust code to collect damages from the Trustee, and to compel the trustee to restore value to the Trust, in substantial amounts.

105.    Plaintiff asserts that Ohle is liable to her for a substantial amount resulting from financial losses suffered by her as a result of the negligent or intentional actions of Ohle, in advising and acting for Plaintiff as attorney, tax consultant, and certified financial planner, for her personal accounts.

106.    The Enterprise owed Plaintiff duties of care, loyalty, and honesty, and a duty to comply with the applicable standards of care.

107.    During the course of their dealings with Plaintiff, Members of the Enterprise made numerous knowingly or negligently false affirmative representations, and intentional or negligently misleading omissions of fact, and gave numerous recommendations, advice, instructions, and opinions to Plaintiff, including but not limited to those acts and/or omissions set forth above.

108.    The Enterprise either knew or reasonably should have known its representations, recommendations, advice, instructions, and opinions to be false. In addition, the rendering of such representations, recommendations, advice, instructions and opinions, as well as the failure to advise Plaintiff of the omissions as set forth herein, was negligent, grossly negligent, and reckless.

28

109.    Plaintiff fully performed her obligations as directed by the Enterprise and its Members and thus did not contribute to the intentional, negligent, grossly negligent, and/or reckless acts in any way.

110.    In reasonable reliance on the Enterprise Members' false affirmative representations and intentional omissions of material facts regarding the transactions at issue, Plaintiff paid exorbitant fees to execute the transaction, did not avail herself of alternative tax opportunities, filed federal and state tax returns that were deemed to reflect improper deductions for capital and ordinary losses resulting from the transactions, and did not amend her tax returns.

111.    But for the Enterprise's failure to meet the applicable standard of care and the intentional and/or negligent misrepresentations and material omissions described herein, Plaintiff would never have engaged the Enterprise for advice on the tax strategies concocted by the Enterprise, never would have engaged in those tax strategies, filed Federal and State tax returns that reflected deductions for capital and/or ordinary losses resulting from the tax strategies, and/or failed to avail herself of other alternative tax opportunities.

112.    After discovering the Enterprise's misrepresentations and omissions, Plaintiff incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

113.    As a result of the Enterprise's conduct set forth herein, Plaintiff has suffered injury in that she, among other things: a) paid to the Defendants and other Members of the Enterprise exorbitant fees, b) took undue financial risk, c) has incurred tax penalties and interest, d) has incurred opportunity costs, e) has incurred and will continue to incur substantial additional costs in hiring new

tax and legal advisors to rectify the situation, f) has incurred reputation damage, and g) has foregone alternative tax opportunities.

114.    As a proximate cause of the foregoing, Plaintiff has been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

## IX.

### SIXTH CAUSE OF ACTION

### BREACH OF CONTRACT

115.    Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

116.    Plaintiff entered into oral contracts with the Enterprise and its Members to provide Plaintiff with professional competent tax advice and services and obtain legal advice and services. In connection therewith, the Enterprise was required and expected to meet all applicable standards of care, to meet the fiduciary duties of loyalty and honesty, and to comply with all applicable rules of professional conduct and to make all of the appropriate disclosures, including but not limited to: a) identifying the various parties involved in the scheme, b) revealing to the Plaintiff the number of other participants in the scheme, and c) revealing the collective number of the strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted, and/or sold, which foreclosed any possibility that the tax authorities would find in favor of the Plaintiff.

117.    The Enterprise ignored its obligations and instead provided Plaintiff with advice, opinions, recommendations, representations, and instructions that the Enterprise either knew or

reasonably should have known to be wrong. In addition, the rendering of such representations, recommendations, advice, instructions, and opinions, as well as the failure to advise Plaintiff of the omissions set forth herein, was negligent, grossly negligent, and reckless. Accordingly, the Enterprise failed to exercise the standard of care required of it and breached its contracts with Plaintiff.

118.    Additionally, the Enterprise and its Members, including but not limited to Defendants, ignored their contractual obligations to Plaintiff by concealing the identity of certain Members of the Enterprise.

119.    As a result of the Enterprise's conduct set forth herein, Plaintiff has suffered injury in that she, among other things: a) paid to the Defendants and other Members of the Enterprise exorbitant fees, b) took undue financial risk, c) has incurred tax penalties and interest, d) has incurred opportunity costs, e) has incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation, f) has incurred reputation damage, and g) has foregone alternative tax opportunities.

120.    As a proximate cause of the foregoing, Plaintiff has been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

## X.

### SEVENTH CAUSE OF ACTION

### CIVIL CONSPIRACY

121.    Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

122.    As described more fully herein, the Enterprise and its Members, including Defendants, knowingly acted in concert to market and implement the fraudulent and abusive tax shelter transactions. In doing so, they acted with full knowledge and awareness that the transaction was designed to give the false impression that a complex series of financial transactions were legitimate business transactions that had economic substance from an investment standpoint, when they in fact lacked those features (which are necessary for successful tax strategies).

123.    The Enterprise acted as described herein according to a predetermined and commonly understood and accepted plan of action, all for the purposes of obtaining professional fees from consumers, including Plaintiff.

124.    The acts of the Enterprise were contrary to numerous provisions of law, as stated herein.

125.    There was a meeting of the minds between and among the Members of the Enterprise, including Defendants, as well as other individuals and entities, both known and unknown, to commit the unlawful acts alleged herein. This conspiracy to commit these unlawful, overt acts, proximately caused and continues to cause Plaintiff damages as set forth herein.

126.    Defendants were paid out of the fees that Plaintiff was told to pay to the Enterprise, without Plaintiff's knowledge.

127.    As a result of the conduct of Members of the Enterprise including Defendants, the Plaintiff suffered injury to her business and property in that Plaintiff has paid to the Defendants and other Members of the Enterprise exorbitant fees and has incurred actual damages and losses in an amount to be proven at trial; has incurred tax penalties and interest and disallowance of other certain deductions; has incurred and will continue to incur substantial additional fees and costs in hiring new

tax and legal advisors to rectify the situation; and has foregone alternative tax and investment opportunities.

128.    As proximate cause of the foregoing, Plaintiff has been injured in an actual amount to be proven at trial and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

129.    The Plaintiffs demand a trial by jury on all causes of action herein and all remdies requested herein.

## XI.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Ecetra N. Ames prays that this Complaint be filed and served on all parties and that there be judgment as follows:

a.    That Ohle be removed as trustee of the Trust.

b.    As to the RICO claim, a judgment in favor of Plaintiff and against each Defendant in solido with all unnamed co-conspirators, for actual damages in an amount to be proven at trial, plus treble damages, attorneys' fees, interest and costs;

c.    As to the Declaratory Judgment and Unjust Enrichment claim, an order on behalf of Plaintiff entering the declaratory relief prayed for herein, together with the return to the Plaintiff of all amounts by which Defendants and other unnamed co-conspirators have been unjustly enriched;

d.    As to the Breach of Fiduciary Duty claim, a judgment in favor of Plaintiff against each Defendant jointly in solido with all unnamed co-conspirators, for actual damages in an amount to be proven at trial, plus attorneys' fees, interest and costs;

e.       As to the Fraud and detrimental reliance claims, a judgment in favor of Plaintiff against each Defendant in solido with all unnamed co-conspirators, for actual damages in an amount to be proven at trial, plus attorneys' fees and costs, and return of all monies paid by Plaintiff herein;

f.       As to the Negligent Misrepresentation claim, a judgment in favor of Plaintiff against each Defendant in solido with all unnamed co-conspirators, for actual damages in an amount to be proven at trial, plus attorneys' fees and costs;

g.       As to the Breach of Contract claim, a judgment in favor of Plaintiff against each Defendant in solido with all unnamed co-conspirators, for actual damages in an amount to be proven at trial, plus attorneys' fees and costs;

h.       As to the Civil Conspiracy claim, a judgment in favor of Plaintiff against each Defendant in solido with all unnamed co-conspirators, for actual damages in an amount to be proven at trial, plus attorneys' fees and costs;

i.       Against each Defendant in solido with all unnamed co-conspirators, actual damages, including Plaintiff's tax liability, interest and penalties; attorneys' fees; costs; interest; and such other and further relief as the Court may deem just and proper; and

j.       That the Court grant such other, further, and different relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

 /s/ H.S. Bartlett III
**GLADSTONE N. JONES (#22221), T.A.**
**LYNN E. SWANSON (#22650)**
**H.S. BARTLETT III (#26795)**
**JONES, SWANSON, HUDDELL &**
**GARRISON, L.L.C.**

34

601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Telecopier: (504) 523-2508
**Counsel for Plaintiff**