UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ECETRA N. AMES                                              CIVIL ACTION

VERSUS                                                      NO. 09-7058

JOHN B. OHLE, III, ET AL                                    SECTION: "C"(3)

ORDER AND REASONS

Before the Court are three Motions to Dismiss submitted by Defendants Denise and Kenneth Brown, (Rec. Doc. 74), Bank One Corporation, (Rec. Doc. 75), and Douglas Steger, (Rec. Doc. 96). Plaintiff opposes the Motions. (Rec. Doc. 98). The Motions are before the Court on the briefs, without oral argument. Having considered the memoranda of counsel, the record, and the applicable law, the Court finds that the Motions to Dismiss are GRANTED for the reasons stated below.

I. Background

Plaintiff Ecetra Ames is the settlor and income beneficiary of a charitable remainder trust, which was executed and designed in 1999 by Defendant John Ohle, who served as trustee. (Rec. Doc. 70 at 2). Plaintiff alleges that Ohle entered into various agreements with the other Defendants to market certain tax strategies that would induce high net-worth individuals to invest in one investment vehicle that would in turn allow the Defendants to fund other transactions. *Id.* at 5. The Defendants allegedly had no intention of informing the investors of how their funds were being redirected. *Id.* Nevertheless the investors would be charged exorbitant fees for these transactions. *Id.* Specifically Ames argues that in 2001, Ohle suggested that she purchase $5 million worth of Carpe Diem Dynamic Fund Linked Warrants. *Id.* at 7. Ames agreed to the purchase and authorized the wire transfer of $5 million from Ames' custody account at the Whitney National Bank to Chase

Manhattan Bank. *Id.* Of the $5 million, $250,000 was withheld as a fee for the purchase of the Carpe Diem Warrants. *Id.* Ames was not informed that there would be any fee for the purchase of the Warrants. *Id.* At the same time that Ohle purchased $4.75 million worth of Carpe Diem Warrants on Ames' own account, he transferred $2 million of the Trust's funds to purchase additional Warrants. *Id.* at 8. This transaction involved a fee of $100,000, which was also not disclosed to Ames. *Id.* On November 27, 2001, Olhe transferred an additional $347,834 from the Trust to Carpe Diem.

In 2002, the Warrants purchased on Ames' custody account were sold for $ 4.1 million. *Id.* at 11. This sale was executed pursuant to a redemption notice prepared by Ohle and signed by Ames. *Id.* At the time Ames believed that the proceeds of the Warrant sale would be transferred back into her custody account. *Id.* However, the proceeds were transferred into the Trust account, which she could not access. *Id.* At about the same time as the sale of Ames' personal Warrants, Ohle also sold the Trust's Warrants, with the proceeds directed back into the Trust account. *Id.*

In March 2003, Ames demanded Ohle provide her with an accounting for the Trust. *Id.* at 12. While it is unclear what that accounting revealed, Ames certainly discovered that she had been charged a total of $350,000 in fees that she had not authorized. *Id.* After uncovering further details of Ohle's mishandling of the Trust, in August 2003, Ames and Ohle executed a Settlement Agreement releasing him and all of his agents from all claims known and unknown regarding the operation of the Trust. *Id.* at 13.

In 2008, Ohle was indicted by a grand jury in the Southern District of New York for mail fraud and a conspiracy to commit income tax fraud. *Id.* at 7. In the course of Ohle's criminal trial Ames discovered for the first time that the $350,000 fee she and the Trust were charged for the

purchases of Carpe Diem Warrants was actually used by Ohle as start-up capital for a tax-fraud conspiracy. *Id.* at 7-10. In addition Ames learned of Ohle's $347,834 transfer from the Trust to Carpe Diem and further discovered that those funds were also used to fund Ohle's income-tax conspiracy. *Id.* at 9.

As a result of these new discoveries, Ames filed suit against the Defendant alleging various theories of liability, including that Defendants were part of a RICO enterprise intended to generate illegal fees and kickbacks from Plaintiff's and the Trust's investments. *Id.* at 17. Plaintiff further alleges that if she had known of the fees beforehand she would not have authorized the purchase of Carpe Diem Warrants. *Id.* Finally, Ames argues that Ohle lied to her in the course of their settlement negotiations because he informed her that he did not receive any portion of the fees withheld from the Carpe Diem investment, when in fact he received substantial portions of those fees. *Id.* at 18.

Defendants have responded to Ames' allegations with a series of lengthy and complex. Motions to Dismiss. (Rec. Docs. 74, 75 & 96). Included in all three Motions to Dismiss is the argument that Ames' claims are prescribed by the four-year statute of limitations applicable to RICO claims. *Id.* Ames responds by arguing that Ohle fraudulently concealed his illegal actions prior to the execution of the Settlement Agreement and she only learned of the facts supporting her claim because of Ohle's recent criminal trial. (Rec. Doc. 98 at 16). Ames argues that either the statute of limitations should begin accruing when she learned of Defendants' fraud or that she is entitled to equitable tolling due to Ohle's fraudulent concealment of his illegal actions. *Id.*

## II. RICO Statute of Limitations

Civil RICO claims are subject to a four-year statute of limitations. *Agency Holding Corp.*

*v. Malley-Duff & Associates, Inc.,* 483 U.S. 143, 156 (1987). The "injury discovery" rule determines when a RICO claim accrues, meaning that the limitations period runs from the date on which "the plaintiff discovers, or should have discovered, the injury." *Love v. Nat'l Med. Enter.*, 230 F.3d 765, 773 (5th Cir. 2000). Even though RICO claims frequently involve complex allegations of fraud and professional negligence, the statute of limitations begins to run when a plaintiff discovers her injury, not when a plaintiff discovers the other elements of a RICO claim. *Rotella v. Wood*, 528 U.S. 549, 555 (2000). The Supreme Court recognized that the "injury discovery" rule requires RICO plaintiffs to actively investigate the causes of their injuries in order to prevent any potential claims from becoming time-barred. *Id.* at 556. However, the Supreme Court found that such a investigatory burden was no different than that placed on malpractice victims. *Id.* Moreover, a requirement that RICO plaintiffs conduct an investigation of the causes of their injuries was consistent with the intent of Congress to use civil litigants as a supplement to government efforts to prosecute organized crime. *Id.*

The Supreme Court has consistently held that a statute of limitations can only be tolled for fraudulent concealment if the plaintiff can "aver and show that he used due diligence to detect [the fraud]." *Wood v. Carpenter*, 101 U.S. 135, 141 (1879). A plaintiff must fully state the circumstances of discovery as well as explain why it could not have been made sooner. *Id.* at 140. In the context of civil RICO the Supreme Court specifically held that "a plaintiff who is not reasonably diligent may not assert 'fraudulent concealment.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997).

### III. Analysis

In the present case, the injury that Ames suffered was the misappropriation of the funds in

her trust account. (Rec. Doc. 98 at 2). It is undisputed that she discovered this injury in 2003. *Id.* at 17. While Ames did discover new information as a result of Ohle's criminal trial, that information did not suggest Ames had suffered a new injury, but rather that her original injury was caused as part of an intentional conspiracy. *Id.* But as the Supreme Court has clearly held, the discovery of other elements in a RICO claim are not relevant for the purposes of when the statute of limitations begins to run. *Rotella*, 528 U.S. at 555. Ames maintains that she did not know until 2010 who actually received the $350,000 in fees she and the Trust were improperly charged. (Rec. Doc. 98 at 17). But the identity of who received the funds does not change her injury of having money misappropriated - even if it might change the remedies she is entitled to. Since she discovered the misappropriation in 2003, the four-year statute of limitations runs from then. *Agency Holding Corp.,* 483 U.S. at 156. Thus, unless Ames is entitled to a tolling of the statute of limitations, her RICO claim is time-barred since she filed this suit in 2009.

The only argument that Ames advances for tolling the statute of limitations is that at the time of her settlement agreement with Ohle he fraudulently concealed the full nature of his acts so that she would settle her claims. (Rec. Doc. 98 at 17). Specifically Ames alleges that Ohle told her that the $350,000 fee that was unauthorized was sent entirely to Defendant Steger and that Ohle received no part of those proceeds. (Rec. Doc. 70 at 13). While it appears that this statement was possibly fraudulent, in order for it to toll the four-year statute of limitations Ames must demonstrate why she could not have discovered Ohle's action through due diligence. *Klehr*, 521 U.S. at 194. However, at no point does Ames suggest that she expended any efforts to research what happened to the actual fee. Moreover, Ames argues that Ohle failed to disclose his transfer of an additional $347,834 from the Trust to Carpe Diem. (Rec. Doc. 70 at 13). However, these transfers were all available in the

5

bank records of the Trust, which obviously could have been the subject of discovery with minimal effort. Indeed, in the final accounting that Ohle provided to Ames there is an entry for $347,834 as a "loan to LFC" on November 21, 2001. (Rec. Doc. 75-4 at 35). Ohle's final accounting is replete with similar "loan" entries, (Rec. Doc. 75-4), despite the fact that he had no authority to loan any of the Trust's funds, (Rec. Docs. 104-4 at 4). Ames was also aware that Ohle had deposited $4.1 million of Ames' personal funds in the Trust's bank account without her informed consent. (Rec. Doc. 70 at 11). Despite these warning signs of misconduct, Plaintiff agreed to settle all known and unknown claims she had with Ohle regarding his management of the Trust. (Rec. Doc. 27-5).

Ames could have conducted further discovery and learned about each and every unauthorized transactions from her own trust account. Since she has not conducted the required due diligence, Ames is not entitled to equitable tolling under the fraudulent concealment doctrine. *Klehr*, 521 U.S. at 194. As a result Ames' RICO claims are time-barred.

In 2001, Judge Duval also dismissed a plaintiff's RICO claims as time-barred when faced with a similar fact pattern. *Astoria Entertainment, Inc. v. Edwards*, 159 F. Supp. 2d 303, 328 (E.D. La. 2001). In that case the plaintiff had been denied a river boat gaming license for questionable reasons, which suggested political interference, but refrained from filing a RICO suit until after the defendants had been indicted. *Id.* Judge Duval went on to write that, "[P]laintiff's dilatory tactics in waiting for the Government to complete its investigation and issue indictments, and then simply incorporating that information to assert its own private action is a far cry from the Supreme Court's stated purposes of civil actions, that is to aid the government and public by taking prompt action." *Id.* The Court agrees with Judge Duval's reasoning. Plaintiff had the chance of uncovering Ohle's illegal activities in 2003, which could have alerted the Government to Ohle's eventual tax-evasion

scheme. But rather than conduct any investigation of her own, she agreed to a settlement of her claims. In light of Ames' failure to exercise due diligence in investigating her known injury, her claim of fraudulent concealment cannot toll the statute of limitations in this case.

Since the Plaintiff's only federal law claims are her RICO claims, and since those claims are dismissed as time-barred, this Court no longer has subject matter jurisdiction over the case. While Plaintiff's several state law claims were properly asserted under this Court's pendant jurisdiction pursuant to 28 U.S.C. § 1367, the Court must now decide whether to retain pendant jurisdiction over those state law causes of action. The Supreme Court has held that "when the federal claims have dropped out of a lawsuit in its early stages and only state law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (quoting *Mine Workers v. Gibbs,* 383 U.S. 715 (1966). Here, Plaintiff's only federal claim has been dismissed at an early stage of the litigation, so this Court declines to exercise pendant jurisdiction over Ames' remaining state law claims.

### IV. Conclusion

Accordingly,

IT IS ORDERED that Defendants' Motions to Dismiss are GRANTED. (Rec. Docs. 74, 75 & 96).

New Orleans, Louisiana, this 1st day of December, 2010.

_____
HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE

7